1

```
                   UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
                        ORLANDO DIVISION



. . . . . . . . . . . . . . ..
                              :
UNITED STATES OF AMERICA,     :
                              :
             Plaintiff,       :
                              :    Case Number
v.                            :    6:22-CR-133-PGB-LHP
                              :    6:22-CR-132-PGB-LHP
NACOE RAY BROWN,              :
                              :
             Defendant.       :
. . . . . . . . . . . . . . ..



           THURSDAY, APRIL 13, 2023; 1:33 P.M.
                SENTENCING HEARING AND
     FINAL REVOCATION OF SUPERVISED RELEASE HEARING
          BEFORE THE HONORABLE PAUL G. BYRON
               UNITED STATES DISTRICT JUDGE



APPEARANCES:

GOVERNMENT'S COUNSEL:
 Michael Felicetta



DEFENSE COUNSEL:
 Joshua Lukman




Official Court Reporter:
 K. Stanford
```
_____
Proceedings recorded by mechanical stenography.
 Transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

1

2          THE COURTROOM DEPUTY:  United States of America

3    versus Nacoe Ray Brown, Case numbers 6:22-CR-132 and

4    6:22-CR-133.

5          Counsel, please state your appearances for the

6    record.

7          MR. FELICETTA:  Good afternoon, Your Honor.

8    Michael Felicetta appearing on behalf of the Government.

9          And I'm sorry, Your Honor.  I do have a request to

10   make before we get started this afternoon.

11         THE COURT:  All right.  Thank you.

12         MR. LUKMAN:  Good afternoon, Your Honor.  Assistant

13   Federal Defender Joshua Lukman on behalf of Mr. Brown, present

14   to my left.

15         THE COURT:  Thank you.  Good afternoon.

16         THE COURTROOM DEPUTY:  Mr. Brown, please stand and

17   raise your right hand.

18         Do you solemnly swear or affirm, under penalty of

19   perjury, that the statements you will give in these

20   proceedings will be the truth, the whole truth, and nothing

21   but the truth?

22         THE DEFENDANT:  Yes.

23         THE COURTROOM DEPUTY:  Thank you.  Please have a

24   seat.

25         THE COURT:  All right.  Mr. Felicetta, I think you

3

1    said you had a request to make.

2            MR. FELICETTA:  I do, Your Honor.  Thank you.

3            Judge, the victim bank has a representative that's

4    here.  We were scheduled to meet at 1:00.  She went to the

5    state courthouse.  She's now here.  She's coming in through

6    security.

7            If I could have just a couple minutes to talk to her

8    before we start the proceedings, in the hallway, I would

9    really appreciate that.

10            THE COURT:  That will be fine.

11            MR. FELICETTA:  Thank you.

12            (Counsel exits at 1:35 p.m.)

13            (The court at ease.)

14            (Counsel returns at 1:38 p.m.)

15            MR. FELICETTA:  Thank you, Your Honor.  I appreciate

16    the Court allowing me that opportunity.

17            And for the record, I'm joined by Special Agent

18    Jonathan Hannigan from the FBI, who is the case agent.

19            And the representative from the bank, who I've

20    spoken to, is the fraud department manager for McCoy Federal

21    Credit Union.  Her name is name is Jennifer Sawotka, spelled

22    S-a-w-o-t-k-a.  She's present.  We've had a couple

23    opportunities to speak and most recently just now.

24    She doesn't have any statements she'd like to make today.

25    She just wanted to be present for the proceedings.

4

1          THE COURT:  All right.  Thank you very much.

2          Mr. Brown, on January 4th of this year, you entered

3   a guilty plea to Count 1 of the indictment, which charged you

4   with bank robbery in violation of Title 18 of the United

5   States Code, Section 2113(a).  I have accepted your plea of

6   guilty and adjudicated you guilty of that offense.

7          We need to discuss a number of matters today in your

8   sentencing, including the Presentence Investigation Report.

9   It's at docket entry 49.  It sets forth the facts of this

10  particular case, your criminal history, your personal

11  background, family history, and other aspects that are

12  pertinent to sentencing, including advisory sentencing

13  guidelines.

14         Have you had the chance to discuss the report with

15  Mr. Lukman to your satisfaction?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  All right.  Mr. Lukman, any objection to

18  the factual accuracy of the report or the guideline

19  calculations?

20         MR. LUKMAN:  There are no unresolved objections.

21         THE COURT:  Thank you.

22         Any objection by the Government?

23         MR. FELICETTA:  No, Your Honor.

24         THE COURT:  There being no objection to the facts

25  contained in the presentence report, I'll adopt those as my

5

1   findings of fact, determine Total Offense Level of 21,

2   Criminal History Category IV, as reported.

3           Is that accurate from Probation?  Is it IV?

4           I see a VI on the supervised release violation.

5       (Pause in proceedings.)

6           THE PROBATION OFFICER:  That is correct.  It is IV,

7   Your Honor.

8           THE COURT:  It's IV.  All right.  Thank you.

9           Criminal History Category IV, providing an advisory

10  range of 57 to 71 months' imprisonment, supervised release of

11  between one and three years, a fine range of between $15,000

12  and $150,000, a special assessment of $100.

13          I don't believe there's restitution in this case.

14  The money was retrieved at the time of arrest.  Is that

15  correct?

16          MR. FELICETTA:  That's correct, Judge.

17          THE COURT:  All right.

18          Let me advise the parties what I've reviewed in

19  preparing for the hearing today.  I went back and read the

20  complaint at docket entry number 1, the indictment at docket

21  entry 16, the presentence report that I've been alluding to so

22  far today.

23          I read the forensic evaluation by Nelson

24  Psychological Services that was ordered by the federal

25  defender's office in this matter.

6

1      I've read the defendant's sentencing memorandum at

2  docket entry 51 and the letters and publications and other

3  materials provided at 51-1.

4      Are there any other written materials by either

5  side?

6      MR. FELICETTA:  No, Your Honor.

7      MR. LUKMAN:  No, Your Honor.

8      THE COURT:  All right.  Then, if you'd care to go

9  first, Mr. Lukman, I'll hear from you.  Then I'll hear from

10  the Government.  And, of course, Mr. Brown can make a

11  statement if he'd like to.

12      MR. FELICETTA:  Your Honor, if I could just make one

13  more point of clarification or ask the Court's permission to

14  proceed today.

15      When we initially discussed a plea in this case, I

16  told defense counsel that I would not be making a guideline

17  recommendation and, therefore, if he wanted to plead max

18  penalty statement, that would probably be the way to go since

19  there's no benefit, really, from us.

20      And then today when I was preparing for the hearing,

21  I realized that the Court requires at docket 47 for me to file

22  something in writing if I intend to go outside the guidelines,

23  and I did not comply with that, Your Honor.  Although that was

24  certainly noted by the parties, the Court didn't know that.

25  So I apologize to the Court.

7

1          I would like to proceed today.  I do intend to seek

2   a sentence outside the guidelines for the reasons stated in

3   the presentence report, but I wanted to let the Court know

4   that and make sure that although I'm running afoul of

5   Your Honor's order, it wasn't intentional, and Mr. Lukman was

6   aware of my intentions.

7          THE COURT:  All right.  Thank you.

8          Mr. Lukman, no surprise in that regard?

9          MR. LUKMAN:  May I?

10          THE COURT:  Yes.

11          MR. LUKMAN:  That's a bit of a nuanced answer.

12          Mr. Felicetta is correct.  From the onset, the

13   representation was that a guidelines recommendation would not

14   be sought; therefore, no benefit for a written plea agreement.

15          I am not privy to what the specific request for an

16   upward variance, I assume, would be.  And, of course, I don't

17   necessarily fault the Government for noncompliance with the

18   Court's sentencing order, but I think one of the benefits of

19   compliance with that order is to give the parties a chance to

20   respond or at least seek leave of court to respond if we know

21   specifically what that request might be.

22          So that's the response.  Yes, the Government is

23   correct.  However, I am not aware of what they'll be seeking

24   as far as an upward sentence.

25          THE COURT:  Thank you very much.  I'm going to allow

8

1    the Government to make its argument.

2         Ultimately, as everyone in the room knows,

3    sentencing is my determination, whether I impose a guideline

4    sentence or one above or below.  I encourage the lawyers to

5    make their arguments so I can hear your perspective, but

6    ultimately I'll carry the burden of making that decision.

7         Mr. Lukman, if you'd like to go, go right ahead.

8         MR. LUKMAN:  All right.  And, Your Honor, may I in

9    my remarks summarily address both cases before the Court?

10        THE COURT:  If you'd like to, yes.  It's roughly the

11   same sentencing memorandum for both.

12        MR. LUKMAN:  Yes, it is.

13        THE COURT:  Take the violation of supervised release

14   next, however, since there has not been a final -- there was a

15   guilty plea, so to speak, in front of the magistrate judge,

16   but I haven't accepted it yet.

17        MR. LUKMAN:  I understand that formality.  Thank

18   you.

19        And, yes, the Court is correct.  Our defense

20   sentencing memorandum was styled and filed simultaneously in

21   both cases.  So Your Honor's correct.  It's the same substance

22   with respect to both.

23        The essence of the mitigation here, just to jump to

24   the chase, is -- or cut to the chase, rather, is the more

25   recent mental health investigation that my office was able to

1    provide Mr. Brown with and the clinical findings from that.

2            A lot of times, it seems like it's a redundant theme

3    with representation from my office where a person comes before

4    the Court and oftentimes, for the first time, has a specific

5    diagnosis because whatever circumstances existed in their life

6    prior to sentencing, they either did not have the resources

7    or, through prior court systems or prior counsel, did not

8    explore certain avenues.

9            But I think that's important in this case because

10   there is a strong nexus, as Dr. Nelson provides in her report,

11   between a bipolar I disorder, a patient meeting criteria and

12   engaging in risky behavior, feelings of being indestructible,

13   having an irrational, urgent, or important mission to

14   accomplish.  Even sexual promiscuity is one of the potential

15   risk factors associated with that.

16           So we have, I think, some perspective that was not

17   available to the prior courts or to Mr. Brown, really, until

18   my office got involved in our representation.

19           So I think that is one of the key answers to the

20   elephant in the room question, why would this time be

21   different from the past, as is so often the question that

22   Your Honor encounters in cases where someone does have a

23   criminal history.

24           The mitigation points that we ask the Court to

25   consider, the offense conduct in this case, without making or

1   belittling the -- without making excuses or belittling the

2   seriousness of the offense, we don't have weapons.  We don't

3   have firearms.  We have a bank robbery with a note.

4   Obviously, a threat was included in that verbiage; however, no

5   violence and no weapons to cause any potential injury or

6   violence.

7          We have an acceptance of responsibility throughout

8   the entire process.  From the initial arrest with the agents

9   and the officers through his guilty plea, through the

10  sentencing hearing, Mr. Brown has demonstrated acceptance.

11         He engaged in a conversation with law enforcement

12  and the prosecution on another matter, but also expressed his

13  remorse, apologies, and accepted responsibility before

14  pleading in this case to the Government.

15         So just as far as attitude goes and him not making

16  excuses for his own conduct, we have a great deal of

17  acceptance on his end.

18         The request on the sentence in this case from the

19  defense is really something that is within the guidelines, and

20  that is because we acknowledge the seriousness of the criminal

21  history.  I expect -- again, without knowing -- that the

22  Government may make an underrepresentation argument as to the

23  guideline scoring in this case.

24         However, the guidelines and the Sentencing

25  Commission and the legislature established a time period by

1   which priors should and should not count, and in this case, we

2   believe that the sentencing guidelines are appropriate.

3           We are not asking for a downward variance on that.

4   And, again, that's just to acknowledge that this is not

5   someone that comes to the Court with a completely clean slate

6   that might warrant that kind of leniency.

7           However, we are requesting that whatever the Court

8   fashions as the appropriate term of incarceration in this

9   case, we are requesting the Court consider concurrence on the

10  violation sentence.  We acknowledge the guidelines call for

11  consecutive sentences.  The statute permits the Court to use

12  its discretion in concurrent or consecutive sentencing.

13          And the Court may be curious as to why in the

14  mitigation we kind of delve into this whole issue with a prior

15  attorney, right, the 2001 bank robbery case with a

16  co-defendant, a few different bank institutions, and that

17  prior attorney more recently falling under investigation,

18  going to trial, and being convicted.

19          Mr. Brown has a pending motion to vacate in that

20  Maryland case.  February 9th, the Government was ordered to

21  respond to his pro se motion.  And as of the 60-day deadline,

22  which would have been just five days ago, the Government has

23  not replied to it.

24          So I wanted to come before Your Honor and perhaps

25  elaborate a little bit further on developments on that issue,

1    but there are none.

2         So the reason we're asking for a concurrent --

3    again, whatever the total sentence might be as far as the

4    appropriate duration from Your Honor -- that would save a lot

5    of trouble for Mr. Brown in the pleading process and appellate

6    process.

7         If he happens to be successful on the prior Maryland

8    conviction on what the Court is construing as a 2255 motion,

9    essentially, he then won't have this tail end of a consecutive

10   violation of supervised release sentence that he'll then have

11   to come before this Court and seek relief on.

12         I hope that makes sense.

13         So that's one of the reasons that we discussed the

14   prior improprieties of prior counsel.

15         THE COURT:  I haven't seen the 2255 motion,

16   obviously, but just from reading the materials you offered,

17   the -- there was in the prior trial for the three bank

18   robberies in Maryland that resulted in the sentence of 300

19   months where about $380,000 was obtained from these banks --

20         MR. LUKMAN:  Yes.

21         THE COURT:  -- apparently by the time of trial, a

22   small sum of money -- not terribly small, but about $36,000

23   was missing from evidence.

24         MR. LUKMAN:  Exactly.

25         THE COURT:  And the question becomes, Who took it?

1   But for purposes of 2255, it's really, What difference does it

2   have on the trial?  If it wasn't evidence in the case, if

3   it's -- you know, unless there's evidence that an investigator

4   who procured a confession or something -- I don't even know if

5   there was one in that case -- were to be found responsible,

6   then I don't know how finding someone responsible for stealing

7   from the evidence room affects the validity of someone's

8   conviction following trial or the fact that their lawyer,

9   years later, became a money launderer and got convicted.  But

10  that's going to be for another court to decide.  I just don't

11  see the nexus between the two.

12          MR. LUKMAN:  Sure.  And that's a very practical

13  inquiry to have.  This is really just the integrity of that

14  whole process.  And we included -- I'm not sure how the

15  Government will respond to this.

16          Mr. Brown has some -- we'll call it speculation, but

17  some strong feelings about that prior representation and

18  potential connections to the homicide of an AUSA that also was

19  involved in that case and potentially even the Court.

20          So we did not want to rehash matters that -- and

21  concerns that he had and made an effort to bring to the

22  Government's attention, but there's just not a lot of concrete

23  information to rely on as far as a proffer or anything like

24  that.

25          There's just all these really bizarre questionable

1   events that unfolded that at least raise a question to the

2   integrity of the representation in that prior case.  And

3   that's why we mention it, not to undo or not consider the

4   sentence for the violation in this case, but to request

5   consideration for concurrence just in the event that he

6   happens to be successful.

7          And really, the only reason the Court might not want

8   to do that is if the Court were hypothetically inclined to

9   impose the maximum terms of incarceration as to both cases.

10  If the Court thought 23 years is appropriate, then that would

11  be the Court's decision.

12         THE COURT:  I'll save you some speculation.  I do

13  not think 23 years is appropriate.

14         MR. LUKMAN:  Then I would ask the Court to consider

15  in tandem what the total amount should be and then consider

16  the concurrence.  And that's just, again, to really alleviate

17  Mr. Brown having to pursue additional appellate avenues in the

18  event of success.

19         Also, something we considered asking the Court for

20  time to do, and Mr. Brown wanted to come before Your Honor for

21  disposition prior to that even playing out, because like you

22  said, Your Honor, we don't know from a practical standpoint

23  whether the integrity of counsel will then implicate a

24  question as to the conviction, the judgment, and the sentence.

25         We included -- let's see here -- some of our more

1    common mitigation, such as character letters.  Unfortunately,

2    Mr. Brown's family members, a few of which have passed away

3    during his term of incarceration previously, and that just

4    kind of plays part and parcel to the PTSD as described by

5    Dr. Nelson in her report and throughout the history and

6    characteristics of the PSR.

7           What is particularly interesting -- and this kind of

8    gets towards the end of our mitigation submissions.  But in

9    those letters -- and I pointed this out in my memo

10   specifically because we have an author of a number of books

11   that appear very inspirational, aspirational, and totally

12   inconsistent with his criminal conduct and criminal history.

13          But just as an illustration, we have a cellmate at

14   the Orange County Jail and that cellmate's parents who

15   submitted letters for the Court's consideration regarding the

16   positive impact that Mr. Brown has on people around him,

17   specifically a very dramatic-sounding circumstance for this

18   young man at the jail who was apparently suicidal.  But

19   through -- let's call it mentoring from Mr. Brown, he turned

20   his attitude around to the extent the parent could observe

21   that.

22          So what we have -- and I don't want to overstep in

23   my characterization here, but perhaps someone who is a better

24   teacher than a learner, if that makes sense.  But Mr. Brown

25   obviously has some talents that could be put to good use, a

1    lot of dreams and aspirations, and unfortunately, with his

2    mental health condition, he made this really terrible

3    decision.  But at least we have the hindsight and the

4    perspective to look at that conduct and the decision behind

5    that conduct with that diagnosis from Dr. Nelson in mind.

6            So the current guideline range, 57 to 71 months, I

7    don't know where the Court stands on that, but we're asking

8    for a combined sentence that falls within that range.  And

9    that may be asking for a bit more than we should, frankly,

10   again, given the criminal history.  But under the

11   circumstances, under the recent diagnosis, under the treatment

12   recommendations, the additional nuances in the history and

13   characteristics, we have someone who was released from a very

14   long prison term, the 2001 case, during a pandemic.

15           This does not make an excuse for the lack of

16   efficacy for any treatment, but it is important to Mr. Brown,

17   so I wanted to, as a conduit, mention this.

18           He has some regrets and some strong feelings that

19   treatment could have been more effective if the surrounding

20   circumstances during that term of supervised release were

21   different, really worldwide.

22           And Dr. Nelson opines that although Mr. Brown has

23   endured various treatment programs -- even in prison he

24   completed a dozen different programs with certifications, but

25   we don't have relevant intervention.  And I think that's the

1    key word.

2         There's no doubt he's been on probation.  He's been

3    on supervised release.  There's been intervention.  There's

4    been counseling.  From Dr. Nelson's perspective, the childhood

5    trauma, the PTSD, and then now the meeting criteria for

6    bipolar I, we don't have the appropriately relevant treatment

7    as an intervention for Mr. Brown.

8         So I think that would leave the open question, How

9    will his circumstances improve going forward with that kind of

10   intervention?  And unfortunately, we ask ourselves now, How

11   could this current situation have been prevented or mitigated

12   had that diagnosis and had that intervention occurred earlier

13   in his life?

14        And we have someone from 16 years old who is treated

15   and sentenced as an adult and then endures really

16   institutionalization since being a mid teenager.

17        I think our filings in this case, Your Honor, were

18   pretty efficient and concise.  I don't have much more to offer

19   unless the Court has any particular questions.

20        THE COURT:  The report by Dr. Nelson, the

21   evaluation, it makes clear in the report that there were no

22   available records of past mental health history available to

23   the evaluator.

24        So what I didn't pick up from the report -- I mean,

25   certainly Dr. Nelson is opining that as of the time of the

1    evaluation that Mr. Brown suffers from bipolar disorder and

2    PTSD.

3            MR. LUKMAN:  Right.

4            THE COURT:  But I didn't see the report looking

5    backward as to what he would have experienced at the time he

6    committed the conduct that gives him the criminal history that

7    he comes before me with, and I don't know if the report was

8    intended to do that.

9            MR. LUKMAN:  I can find the specific verbiage, but I

10   think, in agreement with Your Honor, this appears to really

11   address the instant offense conduct before the Court and not a

12   retrospective perspective of the prior criminal conduct laid

13   throughout the PSR.  So I think I agree with the Court on that

14   regard.

15           This is really, Why did this happen?  Were there any

16   potential factors on the mental health aspect that played into

17   this current conduct?  Not to excuse or diminish the prior

18   conduct.

19           THE COURT:  Didn't the judge in Maryland order

20   mental health treatment and counseling?  I know he didn't have

21   sex offender conditions placed on Mr. Brown when he got out,

22   but didn't he impose mental health treatment?

23           MR. LUKMAN:  Yes.  And there were -- the PSR does

24   indicate a specific month and year that treatment began and

25   then ceased.  I can find that particular paragraph, but, yes.

1    We were not able to locate any particular historic records

2    pertaining to prior diagnosis or mental health.

3            But as far as probation, the Probation Office, who

4    does a very thorough job on this, I would -- if anyone could

5    find something, I would imagine Probation would be of

6    assistance in doing that as well.  We don't have anything

7    indicating prior bipolar diagnoses.

8            THE COURT:  Thank you very much, Mr. Lukman.

9            MR. LUKMAN:  Thank you, Your Honor.

10           THE COURT:  All right.  When you're ready.

11           MR. FELICETTA:  Good afternoon, Your Honor.

12           THE COURT:  Good afternoon.

13           MR. FELICETTA:  Judge, if you were to meet Mr. Brown

14   seated at a cafe and start talking to him, you would probably

15   conclude the same thing I did, that he is a likeable man.  He

16   is smart.  He's intelligent.  He speaks calmly and softly, and

17   he appeals to the good nature of people, which is why I wasn't

18   surprised to see so many letters of support from other

19   prisoners and inmates, even ones currently at Orange County

20   with him, who have expressed great gratitude with how

21   Mr. Brown has changed their lives.

22           He has the ability to speak to people in a way that

23   makes him very likeable.  And if you sat with him at a cafe,

24   you'd probably walk away going, I like that man.  He's a nice

25   guy.

1    But then, if I were to tell you who Mr. Brown really

2    is and what he's done in his life, you would have a really

3    tough time reconciling it.  Because at age -- starting in 1984

4    as a teenager, Mr. Brown robbed ladies of their purses over

5    and over again.  December 18th of 1984, purse-snatching.

6    December 5th of 1984, February 20th of 1985, February 21st of

7    1985, all purse-snatch robberies of women in the Baltimore

8    area, resulting in him being convicted at age 17 and each time

9    getting a rather nominal punishment from the Court for his

10    conduct.

11    I'm sure at the time he was saying things about

12    being young and lacking experience and lacking maturity and

13    having perhaps mental health issues then, but he didn't get

14    that significant of a sentence until February 25th of 1985

15    when he broke into a stranger's home and forcibly raped a

16    woman at knife point.  That's at paragraph 35 of his report.

17    I can think of no more terrifying or violent act,

18    short of murder, than this crime.  And Mr. Brown suffered a

19    seven-year prison sentence, which perhaps, given his age at

20    the time, the Court thought was appropriate under the light

21    of -- in light of all the circumstances.

22    But what did he do with that time in prison after

23    those seven years were up?  Well, we see in paragraph 37 what

24    he did.  For two years, between the years of 1994 and 1995, he

25    repeatedly statutorily raped a 13-year-old.  That went on for

1    two years, and then he was sentenced and this time to a

2    sentence of two years.

3         In 1991, he was convicted of escape.  So he was not

4    real interested in going to prison or willing to go to prison

5    if he could avoid it.

6         And then we have 2001, shortly after he had now done

7    two prison stints, both for rape, where he goes on a violent

8    bank robbery spree in the Baltimore area.  He refuses any kind

9    of plea in the case, goes to trial, and is duly convicted and

10   is sentenced to 25 years' imprisonment.

11        Shortly after he was convicted on that offense,

12   you'll note in the report at paragraph 38, he attempted to

13   escape again.  And he had a woman send him a package

14   containing hacksaw blades, a glass cutter, with an intention

15   to avoid that lengthy prison sentence because he didn't want

16   to go back to prison.  He had already been there twice.  But

17   this time it was federal prison, and this time it was 25

18   years.

19        Now, what took place between his incarceration on

20   May 11th, 2001, and his release on October 7th, 2020 -- that's

21   19 years and five months in federal prison -- is a non-stop

22   barrage of 2255 petitions, motions to the Court, letters to

23   the Court, letters to counsel, letters to the Government, over

24   and over and over again, hundreds of docket entries on that

25   file, the file that's before Your Honor today, all with

1   Mr. Brown attempting to say something wasn't done right.  He

2   didn't get a fair shake.  Someone did something that shouldn't

3   have happened.  He should be released.

4           And this went on over the transfer of multiple

5   AUSAs, multiple defense attorneys.  This went on over the

6   transfer of even multiple district court judges until finally

7   a judge in Maryland, a judge who had just been re-assigned

8   this case and during the height of the pandemic in September

9   of 2020, granted his motion for compassionate release and let

10  him out early.  She gave him a break.  She saved him over five

11  years' imprisonment by letting him out early on compassionate

12  release.

13          And what did he do?  His gratitude for that break

14  that he received, the break that he asked for hundreds of

15  times in letters and promised that he would be a Christian,

16  God-fearing, law-abiding citizen in our society, it took him

17  18 months and three weeks before he walked into the McCoy

18  Federal Credit Union and handed a note to a 20-year-old man

19  who had just started working in the banking industry, a note

20  that said, Keep smiling.  I have a gun.

21          And that young man, when he wrote a report to the

22  bank shortly after this, said, I didn't see a gun, but I saw

23  the note.  And I wasn't going to waste any time looking for a

24  gun because I was scared.

25          That young man no longer works in the banking

1    institution.  He's left McCoy Federal Credit Union.

2           Nacoe Ray Brown, I can tell you from my own

3    conversations with him, is a polite, well-spoken, and likeable

4    man.  But when you look at what he's done in his life, you

5    cannot reconcile those two things.

6           He's going to get the chance to speak to Your Honor,

7    and I would ask the Court to just keep in mind who it is

8    that's speaking to you.  And a person's actions speak louder

9    than their words.

10          With respect to the sentencing in these two cases,

11   first let me start with the violation of supervised release

12   under file 132.

13          This matter was transferred to Your Honor to be

14   heard at this time because I asked Probation if it would be

15   appropriate to do, and courts on both sides, both districts,

16   agreed.  And I think it is appropriate because Your Honor, I

17   think, is in the best situation to evaluate him now.

18          He was in federal prison for a long, long time, but

19   he got a break.  He got out early.  And now he faces that

20   petition as a guideline Criminal History Category VI, and he

21   is going to be sentenced as a Category VI on that file because

22   that's what the law proscribes.  His guideline range is 33 to

23   41, but it exceeds that which is the statutory maximum of 36

24   months.

25          I'm asking for the statutory maximum of three years,

24

1    36 months, because that is fair given the circumstances of

2    that underlying conviction and given what he did as a result

3    of the benefit of getting out early.

4            He deserves those full three years.  He owes those

5    full three years.  And they should run consecutive to any

6    sentence on what he did here in Florida.  That's a separate

7    offense for which he got a break after a jury trial, after

8    being duly convicted, and he owes that time back to BOP.

9    He should not get a concurrent sentence.

10           And I join with this Court.  I agree with

11   Your Honor.  All the things that he's raised about the missing

12   money and his prior defense counsel now being convicted of

13   money laundering, these are all red herrings.  These have all

14   been raised in the court in Maryland many, many times.

15   None of it is relevant.  It's all a red herring.  It has

16   nothing to do with what his robbery spree was and what he was

17   duly convicted of by a jury.

18           The missing money is an open investigation.

19   I looked into this.  The murder of -- or the death of

20   Jason Luna, who is the attorney who represented the

21   Government in that trial, is still an open and unsolved

22   matter.

23           But I can assure the Court, after thoroughly --

24   myself and Agent Hannigan -- after thoroughly looking into

25   that matter and learning as much as we could about the

1   investigation over the last 20 years, there is nothing that

2   we uncovered that I feel duty-bound to tell this Court has

3   anything to impair the integrity of his conviction

4   whatsoever.  Nothing.  Not his lawyer, not his

5   representation, not the agent, and nothing else.

6          Now, with respect to the underlying robbery here in

7   Belle Isle, Your Honor, the defendant, you know, he took

8   advantage of an opportunity because it was in front of him.

9   You know, it's said that we reap -- or that we covet that

10  which we see.  And the defendant was staying at a hotel room

11  directly across from the bank.  He needed money.  He was seen

12  in this bank.  He was watching the bank.  And he had devised a

13  plan.

14         He devised a plan for a disguise.  He stashed the

15  disguise and a change of clothes over at the convenience store

16  across the street.  He carefully planned when he would enter

17  the bank, who he would approach, which teller, what the note

18  would say.  He would retrieve the note and the money, and he

19  would quickly change outfits, go back to the hotel, change

20  again, and attempt to immediately leave.

21         But fortunately, a very good bank manager watched

22  carefully, was able to recognize him.  Police arrived very

23  quickly in Belle Isle, as they always do because it's a small

24  community, and they caught him as he was coming off the

25  elevator to the hotel with the money in his hands in a bag

1    along with other evidence from the crime.

2         And initially, he denied.  He falsely denied he had

3    nothing to do with this.  He was calm.  He was polite.  Some

4    of the police officers were unsure until he was identified.

5    And then after, at the police station, he caved, and he began

6    admitting his role in this bank robbery.

7         Your Honor, the guideline range of 57 to 71 is

8    inadequate for the reasons that Probation said under 4A1.3.

9    An above-guidelines range is appropriate.  How much?

10   Your Honor is an experienced jurist and I think can come up

11   with a number.  I am not going to suggest to Your Honor what

12   that number should be.

13        But even if you took him at a Category VI, which he

14   admittedly should be, that's 77 to 96 months.  That's eight

15   years at the upper end.  That eight years is still inadequate,

16   because he's still young enough that when he gets out -- he's

17   55 right now -- when he gets out, he is still going to pose a

18   grave risk to the community, of any community that he's in,

19   because Mr. Brown has shown who he truly is, a person who is

20   incapable of leading a law-abiding life.

21        Thank you, Your Honor.

22        THE COURT:  Thank you.

23        Mr. Lukman, since the VOP was discussed or the

24   violation of supervised release was discussed, do you have

25   additional comments you'd like to make regarding it?

27

1        I did take the plea at docket entry 30.  I think

2   earlier I said the magistrate did, but I took the plea as to

3   the violations on January 4th of 2023.  And there is the -- of

4   course, the guideline range has been set forth by Probation.

5   We can take that separately.

6        But if you have additional comments, you can do them

7   now, or I can take that as a second sentencing after this.

8        MR. LUKMAN:  I would just very briefly offer,

9   Your Honor, that these -- both cases before the Court are so

10  heavily intertwined.

11       We do have some relatively significant duration of

12  compliance with the conditions of supervision, obviously not

13  to the satisfaction of really anyone else.  Could have, should

14  have, would have been better, but there's some indication that

15  he has the capacity to comply.  And the violation is strictly

16  the new law violation in this case.

17       THE COURT:  All right.

18       Let's take these one at a time.

19       Mr. Brown, if you'd like to be heard, I would be

20  interested in hearing from you on the new bank robbery.

21       We'll talk about the violation of supervised release

22  after this.  But on the new bank robbery charge to which you

23  pled guilty and which you've heard the lawyers arguing their

24  respective positions on, you have an opportunity to be heard

25  if you'd like to.

28

1          And if you'd like to, now would be the time to do

2    so.

3          THE DEFENDANT:  Yes, sir.

4          First of all, I want to thank you for giving me an

5    opportunity to speak.  I want to give honor to you and to this

6    court and to all the officers of the court.

7          I want to also sincerely apologize to the Middle

8    District of Florida and to all the officers of the court that

9    took their time and their resources to prosecute this case and

10   to look over this case.

11         I don't want to rehash or regurgitate what's been

12   said about my past.  I definitely want to give you a picture

13   of the true me.

14         And I respect what the AUSA has said and their due

15   diligence in looking at my past.  In the same token, there was

16   no mention of an 11-year-old boy growing up in a middle-class

17   environment.

18         My father was a pastor of a community church.  My

19   mother was a full-time mother and wife.  And we had Christmas.

20   We had holidays.  We lived in a nice environment, backyard,

21   front yard.  It was six of us, three boys, three girls.  And

22   life seemed to be great.  Went to school.  I had friends in

23   the neighborhood.  But at 11 years old, I went over my -- one

24   of my cousin's houses, female cousin's.  And for that whole

25   summer, I was molested.

1      I was introduced to sex premature.  And this went on

2  from 11 until about 17.  And my life changed from there.

3      Two children came from that abuse.  I didn't know it

4  was abuse at the time.  And when I shared it with certain

5  people, particularly my older brother, they didn't believe me.

6  I was too young to experience something like that.  And it was

7  only until my daughter came out -- came forth that everyone

8  began to believe what I was saying.

9      And even then, my family was kind of old-fashioned,

10 conservative, genuine loving people, but old-fashioned in that

11 they didn't know how to handle something so devastating.  And

12 so they brushed it under the carpet, and we went on as

13 business as usual.  But the abuse continued.  Another child

14 came, and the same process.

15     So this is where I begin to try to separate myself

16 from the trauma.  And the next thing I know, I'm in the

17 criminal lifestyle and doing things that I just couldn't

18 explain, doing things that -- trying to bring me some type of

19 relief.

20     Then, at the age of 17, I did get convicted of some

21 crimes, and I supposed to have went to a juvenile the first

22 time being convicted of a crime.  Instead of going to a

23 juvenile facility, I went to an adult prison, only to find out

24 years later that that was illegal, and away from my family for

25 the first time, away from my mother, my father for the first

1   time, and did eight years and nine months.

2          After doing those eight years and nine months,

3   coming back into society, I had some ideas and some concepts

4   that I wanted to apply.  I discovered the ability to write.

5   And for me, writing was to fight the -- fight the voices, the

6   negative voices that was saying that I was nothing, that no

7   one believed me, that no one have confidence in me, that I was

8   going to not be successful.

9          And so I wrote and discovered the ability to write

10  books, movies, music, poems, and all those things.  Once

11  again, I wasn't trying to be an author or a writer, more that

12  I was trying to fight for my sanity, fight for my identity.

13         Once again, because of my family was in the public

14  light and did not want the publicity, they didn't know how to

15  address the trauma that I was having, and so they kind of

16  brushed it under the rug.

17         So I was fending for myself in writing, fending for

18  myself.  And even when it came to learning and teaching

19  others, I was trying to give others what I was not getting

20  myself.  If I could help somebody, maybe somebody could help

21  me.

22         And so that day, that particular day, I did not plan

23  to rob a bank.  I did not plan to come to the Middle District

24  of Florida and rob a bank.

25         After 19 years of incarceration and after 14 books

1   and umpteen movies, I had a promising future and a promising

2   opportunity.  And a few companies, distributing companies --

3   Liongate was one of them -- liked the material that I was

4   producing, the content I was producing.  And my dream and my

5   aspiration was to pursue that field.  And, once again, I find

6   myself in a situation acting and don't know why I'm acting the

7   way that I'm acting.

8           Now, I will say I'm going to ask, humbly request the

9   Court to consider doing something that no one have done for

10  me.  As much as my mother and my father loved me, they never

11  did this for me.  As much as the original judge, who sentenced

12  me to 12 years, never done for me.  The only person who came

13  close to doing it was Judge Davis, who saw that I had trauma

14  that had been -- haven't been addressed, and he says that I

15  should take this mental health treatment.

16          But because of COVID-19, a stay-in-place order, I

17  was not able to do it.  And so I did do the evaluation and I

18  was given a disorder adjustment -- excuse me -- adjustment

19  disorder, a diagnosis.  But because I had to stay put until

20  the ban was lifted, I couldn't go immediately.

21          And then when I did go, they was not -- it wasn't

22  adequate at all, not for my trauma, not for the deep childhood

23  trauma that I had.  And they was also somewhat star-struck

24  when they discovered I wrote 14 books and doing movies, and it

25  seemed like we spent more time talking about the movie and the

1   books and asking for autographs than dealing with the issue I

2   had.

3        And so I take full responsibility.  I want the Court

4   to know and I want the McCoy bank to know that I apologize.

5   And if the young man was here today, I would look him in the

6   eye and tell him, I sincerely apologize.  I did not mean to

7   traumatize him in any way.

8        But the reason why I'm here today is because I did

9   receive the punishment.  I received the punishment at 17.  I

10  received the punishment at 30, 33, and 34.  I received the

11  punishment, but I never received the treatment.

12       The first time that I talked to Dr. Nelson, I cried,

13  because for the first time, someone was hearing me and

14  believing that this is what I went through.

15       And when she said to me, I'm shocked that you went

16  through this but no one gave you the treatment.  And I don't

17  mind going through -- you know, we all have hardship in life.

18  We go through something in one way or another.  So I'm not

19  saying my trauma is different or my trauma is special.  I'm

20  just suggesting that if I would have got the treatment at 11

21  years old or got the treatment at 17, or even when I came out

22  at 26, I wouldn't be here today.

23       I'm just asking, can -- for the first time in my

24  life, can someone give me grace and say, let's separate the

25  patient from the prisoner or the patient from the offender?

1        And I'm just -- only going to say this just for the

2   record.  I'm not the only one.  I'm not the only one.  And I'm

3   not talking about everyone in prison that is suffering from

4   mental health more than I'm talking about the ones who never

5   got a chance to see a therapist, to get a diagnosis, and get

6   treatment.

7        And so I'm asking the Court and I'm asking

8   Your Honor -- I'm a little nervous -- to consider not sending

9   me to prison at all.  I know it would be something that would

10  shake the nation.  It may be something that would shake the

11  entire court system.  But consider not sending me to prison at

12  all, but saying, I'm going to assign you to a doctor and I'm

13  going to assign you -- and this doctor is capable of giving

14  you medication for your bipolar, for your over 40 or 50 years

15  of trauma.

16       And I can guarantee to everyone in this room that I

17  will be a productive citizen, and I will be a credit to your

18  decision of giving me a chance and giving me an opportunity

19  with the proper resources.

20       I'm not saying I don't deserve some type of

21  punishment.  I'm just suggesting, can you please consider

22  giving me treatment more than punishment?

23       Thank you.

24       THE COURT:  Thank you.

25       THE DEFENDANT:  Oh.  And God bless America.

34

1          And God bless the Middle District of Florida.

2          And God bless Israel.

3          THE COURT:  Mr. Brown, in the imposition of a

4    sentence -- and you've been through this process before in

5    your life, but it's different each time.  And it should be

6    individual each time.

7          There are a number of factors I need to take into

8    consideration.  I have to consider the guidelines and what

9    they recommend and whether they're adequate in what they're

10   recommending.  Sometimes they are too high.  Sometimes they're

11   too low.

12         And I have to consider sentencing considerations

13   that Congress has directed me to, including the nature and

14   circumstances of this crime, your criminal history, the need

15   for the sentence to reflect the seriousness of this offense,

16   promote respect for the law, and provide just punishment.

17         The sentence must deter you from future criminal

18   conduct and provide general deterrence to anyone who might

19   hear about this case.  It has to protect the public from harm.

20   It has to provide you with needed correctional treatment.

21   In the end, it should be sufficient but not greater than

22   necessary to comply with these principles.

23         The bank robbery charge to which you pled guilty --

24   and I do recognize you pled guilty.  That's a very important

25   first step that every person takes.  You could easily have

1  said, I insist on a trial, and put the Government through the

2  burden of that.

3       You had asked for a lawyer initially when you first

4  spoke to the police.  That's fine.  You're entitled to do

5  that.  And then, as you were with them, you slowly started

6  talking about the case and admitted what was going on.  Even

7  when they cautioned you, you'd have to do that on camera, you

8  continued doing it.

9       I agree with everything that both lawyers have said

10  about you in this regard.  It is very, very hard to reconcile

11  the person that I'm speaking with right now to the person I

12  see on paper.  It's really difficult for me to comprehend how

13  a person could be as thoughtful as you are and who can and at

14  times really demonstrate compassion for other people -- the

15  cellmate you had who was going through a very difficult time,

16  you know, taking the time to try to monitor him and talk to

17  him about dealing with being incarcerated.  I can't imagine

18  what it's like to be locked away.  I just can't imagine a loss

19  of freedom and isolation and everything else that goes with

20  it.

21       There's not a single time that I have imposed a

22  sentence where it's lost on me that the person is being

23  condemned to a period where their life is going to be changed

24  immeasurably.  And they've done something to bring it about,

25  but it's not lost on me that you're going to be placed in a

1    setting that is really difficult and very challenging.

2        And so you have this capacity for really deep

3    thought and compassion and all the good things you want to

4    have in people.  And I do appreciate that sexual abuse as a

5    child, which I have no reason to doubt happened, can impact

6    somebody.  Often, abused people become abusers.  It's a coping

7    mechanism I don't understand, but psychologists tell me it's a

8    real reality of that kind of trauma.  You probably have not

9    been treated for it properly.

10        I have to reconcile with this, however, Mr. Brown,

11    the propensity to commit crime that you seem to have and have

12    a hard time shaking.  So as a young boy -- you know, young

13    people do foolish things.  And a 16, 17-year-old who's engaged

14    in purse-snatching, it could be acting out.  It could be a

15    variety of things, acting out against parents who were very

16    strict and a father who holds certain values that you may be

17    rebelling against.  I have no idea.

18        So those judges back then treated you with some

19    leniency because they probably saw a young person who's doing

20    what young people sometimes do, not to excuse it, but to put

21    it in some context.

22        Things turned drastically different with the

23    second-degree rape case.  You were in that woman's house.

24    Her parents -- her mother and the mother's boyfriend were in

25    the house.  And as Mr. Felicetta relayed the facts, there's no

37

1  point in going through them again, but she would have been

2  absolutely horrified.  And for that, you received a pretty

3  long sentence.  You indicated you did about eight years and

4  nine months on that.

5       There was an escape attempt that followed

6  afterwards, and then, of course, when you do get out of jail,

7  it's not very long before you're in a relationship with a

8  13-year-old, which, again, may go back to the way you

9  experienced sex as a very young person.  But as a man, who at

10  that time would have been well into your 20s, you would have

11  known this is inappropriate.  Even if it's so-called

12  consensual, a child can't consent.  And you get two years for

13  that.

14       Very shortly after getting out from that period of

15  time is the string of bank robberies that, from reading the

16  facts, must have been pretty egregious and pretty violent, or

17  at least the threat of violence had to be present, because you

18  came away with a substantial amount of money.

19       As you know, most bank robberies are a few thousand

20  dollars at best.  That strikes me more as jumping the counter

21  and holding people in a way that was very threatening.  And

22  the judge there saw it as a serious string of very violent

23  bank robberies and sentenced you to 25 years.

24       And then, of course, COVID came.  And a different

25  judge probably, I would imagine, looked at the amount of time

1    you did and thought, you know, this is a good reason to let

2    somebody out who's served the vast majority of their sentence,

3    you know, maybe give him that second chance, shave five years

4    off the case.

5            I think I let one person out early during COVID.

6    Overwhelmingly, I felt COVID was not a significant factor to

7    releasing people.  But that judge saw you probably for all of

8    this, that there was a long period of incarceration -- not

9    always without issue.  You did a lot of good programs, but you

10   also had times where you wouldn't show up for lineup or you

11   had issues related to disciplinary infractions.  But 20 years

12   in jail, you know, that's not all that surprising.

13           Then, of course, you're on supervised release, where

14   it's a privilege to be out five years early.  And, as the

15   Government said, in roughly 18 months, here we are with this

16   bank robbery that was more than a crime of opportunity,

17   because there was some level of planning.  Hiding the

18   clothing, taking the note back, that's something that people

19   who are experienced in robbing banks know to do so that they

20   don't leave fingerprints behind or other forensic evidence.

21   And so that's happening while you're on supervised release.

22           So you have this enormous amount of your life you've

23   spent in jail, you know, 29 years or so in jail.  And then

24   shortly after getting out, it's not long before you're back

25   engaging in criminal conduct.

1          And I understand the bipolar diagnosis can affect a

2    person's rational choice.  It's a little bit undercut,

3    however, by the planning that went into the robbery, meaning

4    setting aside the clothing, all of that leading up to the

5    robbery.  A bank robbery doesn't take a lot of preparation,

6    but it took some.

7          And so it just leaves me with this dilemma of

8    wanting to believe that you're a changed person who, if given

9    an opportunity and given all the counseling in the world, will

10   go on to live a productive life.  But time and time again

11   you've demonstrated that's not really who you are, at least

12   not the way you conduct yourself, and for reasons that are

13   partly your fault, partly, perhaps, a result of your

14   childhood.

15         The guidelines in this case do not take into

16   consideration, in my view, the fact that you had served such a

17   very long time for the same offense conduct and you were

18   released early, given that moment of grace by that judge, you

19   get out, you're on supervision, and you're back at it again.

20   I don't think the guidelines properly capture that.  They

21   speak to your criminal history, but this is really specific to

22   what you do when you're not in custody.

23         And so the guidelines treat this case as if it's a

24   one-off bank robbery, perhaps, with a prior criminal history

25   that could be all sorts of things, leading to a history IV.

1   And I don't think that adequately reflects the seriousness of

2   the offense conduct.

3           So a guideline range of 57 to 71 months is basically

4   five to six years, roughly, is what the guidelines calculate

5   to.  The crime itself carries a 20-year maximum.  I certainly

6   think that's too much.  But I think a sentence above the

7   guidelines is appropriate.

8           To the extent you're requesting a non-incarcerative

9   sentence, I just can't, in all good conscience, do that and

10  meet the factors that Congress has asked me to consider in

11  imposing a sentence.

12          I've considered the advisory sentencing guidelines,

13  I've considered the policy considerations in 18 USC,

14  Section 3551 and 3553, and I have given you the opportunity to

15  be heard on this particular case.

16          After considering all those factors, including the

17  mitigating factors, all the good works you've done with other

18  people in jail, the fact that you've had some diagnosed mental

19  health issues that have gone largely untreated, I believe that

20  a sentence of 96 months meets the sentencing considerations

21  that Congress has set forth, and, therefore, you're committed

22  to the custody of the Bureau of Prisons for a term of

23  96 months on this count.  We'll talk about supervised release

24  in a moment.

25          Upon release from imprisonment, you will serve three

41

1    years of supervised release.  While on supervised release, you

2    will comply with the mandatory and standard conditions adopted

3    by the Court in the Middle District of Florida and the

4    following special conditions:

5         You will participate in a mental health treatment,

6    either outpatient or inpatient, and follow Probation's

7    instructions regarding this directive.  You will contribute to

8    the cost of these services in an amount that's reasonable

9    based on Probation's sliding scale for mental health treatment

10   services.

11        While on supervised release, you will submit to the

12   search of your person, your residence, place of business, and

13   any storage units under your control, including your vehicle.

14   And this will be conducted by Probation at a reasonable time

15   and in a reasonable manner based on reasonable suspicion of

16   contraband or evidence of a violation of a condition of

17   release.

18        You have to tell anyone you live with that the home

19   may be subject to search, and if you fail to submit to search,

20   that could be grounds to revoke your supervised release.

21        You may not incur new credit card charges or open

22   additional lines of credit or obligate yourself for any major

23   purchase without approval of Probation, and you'll provide

24   Probation any requested financial information.

25        You are required to cooperate in the collection of

42

1   DNA as directed by Probation, and you must submit to random

2   drug tests not to exceed 104 tests per year, although the

3   mandatory drug testing requirements of the Violent Crime

4   Control Act are suspended.

5           Based on your financial status, I will waive the

6   imposition of a fine.  There's no forfeiture since the

7   proceeds were recovered.

8           You must pay the United States a special assessment

9   of $100, which is due immediately.

10          I find the sentence is sufficient but not greater

11  than necessary to comply with the statutory purposes of

12  sentencing.

13          Having pronounced sentence as to this case, does

14  counsel for the defense or the Government object to the

15  sentence or the manner in which it's been stated?

16          MR. FELICETTA:  No, Your Honor.  Thank you.

17          THE COURT:  Mr. Lukman?

18          MR. LUKMAN:  Respectfully, may the record reflect a

19  substantive and procedural reasonableness objection?

20          THE COURT:  Certainly.

21          You'll be remanded to the custody of the United

22  States Marshals to await designation by the Bureau of Prisons.

23  While in the custody of the Bureau of Prisons, I will

24  absolutely recommend and hope that they provide you with all

25  needed mental health treatment and counseling services.

1        You have the right to appeal from the sentence

2   within 14 days from entry of the judgment.  Failure to appeal

3   within 14 days is a waiver of your right to appeal.  You have

4   the right to the assistance of a lawyer in taking an appeal,

5   and if you cannot afford an attorney, one will be provided for

6   you.  If you cannot afford the filing fee, the Clerk of Court

7   will accept the notice of appeal without payment of the fee.

8        Let's turn now to Case number 22-CR-132, the

9   violation of supervised release.

10       As mentioned before, just a quick procedural

11  history.  Supervision was imposed in the District of Maryland

12  and transferred here.  See docket entry 12.  You had an

13  underlying sentence at docket entry 12-1 of 300 months, plus

14  five years of supervised release.

15       On January 4th, 2023, you admitted to the violations

16  set forth in the superseding petition to revoke supervised

17  release.  And that violation consists of the new criminal

18  conduct, which is the bank robbery occurring on June 28th,

19  2022, while on supervision.

20       This is a Grade A violation, Criminal History

21  Category VI, calling for an advisory range of 33 to 41 months'

22  imprisonment, with the de facto cap being 36 months due to the

23  statutory maximum of three years.

24       I have considered the sentencing memorandum in

25  preparing for the hearing submitted by the defense, which is

**44**

1  substantially similar to the one submitted in the underlying

2  criminal case -- or the new criminal case, I should say.

3          The parties have been heard on this matter.

4          Mr. Lukman, if you'd like additional comment, I'm

5  more than happy to hear from you.  I have taken into

6  consideration your argument about concurrent versus

7  consecutive and the practical implication, as well as the

8  overall sentence that you believe is appropriate, but if you

9  want further comment, I'm more than happy to give it to you.

10          MR. LUKMAN:  One very short comment, Your Honor.

11          THE COURT:  Certainly.

12          MR. LUKMAN:  And this plays partly into the Court's

13  reasoning in its prior judgment and sentence and the

14  guidelines applicable to the new substantive law violations.

15  I'm not rehashing that.  The Court's ruled.

16          But I did just want to point out in the final PSR,

17  doc 49, between paragraphs 39, 40, and 41, the Court had

18  mentioned earlier that this is not a typical one-off or first

19  offense bank robbery type of situation here.  However,

20  Mr. Brown's guidelines with an initial criminal history score

21  of V would have placed him at a Category III.  So he's

22  actually already been bumped up to a Category IV by virtue of

23  the fact that the guidelines account for a new law violation

24  while on a term of supervision.

25          THE COURT:  Right.

1          MR. LUKMAN:  I just wanted to bring that to the

2     Court's attention.  I'm sure the Court considered it, but it

3     was not articulated.  So I just felt compelled to mention

4     that.

5          THE COURT:  That's true.  There's an enhancement in

6     the new law case because it happened on supervision.  And I

7     take your point that if he's being punished already or

8     punishment is considered because he's on supervision, a new

9     supervised release should factor in that he had some

10    additional exposure based on that.

11         MR. LUKMAN:  Some consideration.

12         THE COURT:  Yes.  Makes sense.

13         MR. LUKMAN:  Thank you.

14         THE COURT:  Mr. Felicetta, is there anything you'd

15    like to add that you haven't already said?

16         MR. FELICETTA:  No, Your Honor.  Thank you.

17         THE COURT:  Mr. Brown, would you care to make any

18    comment concerning the violation of supervised release?  I

19    heard everything you said and I will certainly consider it,

20    but I don't want to foreclose you from being heard again if

21    you would like to.

22         THE DEFENDANT:  No, sir.

23         THE COURT:  I do agree with Mr. Lukman that the new

24    case -- the new case brought as a result of the actual bank

25    robbery takes into consideration to some extent you're on

1    supervised release and it enhances your punishment.

2           I found an above-guideline sentence was appropriate,

3    but that does not eliminate the fact that the range from which

4    I departed included the fact that you were on supervised

5    release.

6           You've pled guilty to the violation, and I accepted

7    your plea of guilty previously.  I, therefore, order that your

8    supervised release is revoked, and you're committed to the

9    custody of the Bureau of Prisons for a term of 24 months.  The

10   term of imprisonment imposed will run consecutive with the

11   term of imprisonment imposed in 22-CR-133.  Upon service of

12   the sentence, you will be discharged from further jurisdiction

13   of the Court.

14          You will cooperate in the collection of DNA as

15   directed by Probation.  And I have considered the factors in

16   18 USC, Section 3553, which I discussed at length in the prior

17   proceeding that we just concluded, and the policy statements

18   issued by the Sentencing Commission.

19          So it's 96 months on the new case, 24 months on the

20   supervised release violation because it is a separate offense

21   violating the conditions of supervised release.  I do think

22   that even though that's below guidelines, it's adequate to

23   serve the purposes of sentencing.  A consecutive sentence is,

24   however, appropriate.  That's consistent with guideline

25   policies and makes sense so as not to discount the fact that

1    you were on supervision in another district and then

2    transferred here at the time of the offense.

3            Is there any objection to the sentence or the manner

4    in which it's been stated, Mr. Lukman?

5            MR. LUKMAN:  And again, respectfully, if the record

6    may simply reflect a procedural and substantive reasonableness

7    objection.  And I always stutter through those terms.  I

8    apologize.

9            THE COURT:  I understand.

10           Any objection by the Government?

11           MR. FELICETTA:  None, Your Honor.  Thank you.

12           THE COURT:  You are remanded to the custody of the

13   United States Marshals to await designation by the Bureau of

14   Prisons.

15           While you serve this consecutive part of your

16   sentence, to the extent necessary, I still recommend Probation

17   provide you with needed mental health treatment and

18   counseling.

19           You have the right to appeal from this sentence

20   within 14 days from the date of judgment being entered.  If

21   you fail to appeal within that time frame, you waive and give

22   up your right to appeal.  You are entitled to the assistance

23   of a lawyer in taking this appeal.  If you cannot afford one,

24   an attorney will be provided.  If you cannot afford the filing

25   fee, the Clerk of Court will accept the notice of appeal

48

1    without payment of the fee.

2          MR. LUKMAN:  Would Your Honor consider a

3    recommendation for Maryland for next of kin proximity?

4          THE COURT:  I'd be happy to.  I'll recommend

5    incarceration as close to Maryland as possible.

6          MR. LUKMAN:  Thank you, Your Honor.

7          THE COURT:  The combined sentence, Mr. Brown, is

8    120 months.  That is a long time, and I'm well aware of it.

9    I just in good faith could not fashion a sentence that was

10   lower and feel that that met the purposes of sentencing that

11   are appropriate.

12         Ten years is no small sentence.  I know you've been

13   down that road before, and regrettably, you're doing it again.

14   I hope that when you're done with incarceration this time,

15   that it's your last time.  I hope you get the counseling you

16   need while you're in jail and that you're able to be

17   successful and lead a productive life when you get out.

18         Anything else, gentlemen?

19         MR. FELICETTA:  No, Your Honor.  Thank you.

20         MR. LUKMAN:  No, Your Honor.  Thank you.

21         THE COURT:  Thank you.

22      (Adjourned at 2:45 p.m.)

23                    *     *     *     *

24

25

49

1                    Certificate of Official Reporter

2     I certify that the foregoing is an accurate transcript of the

3     record of proceedings held in the above-entitled matter.

4
      Koretta Stanford
5     _____
      Official Court Reporter
6     United States District Court
      Middle District of Florida      Date:  06/30/2023
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25